GENEVA LEE ROBERTS, Plaintiff-in-Error, v. LINDA VAN ALLEN HOUSTOUN HICKSON, LAWRENCE ORSON HOUSTOUN, JR., and NORMAN SPRAGUE, Defendants-in-Error. —343 S. W. (2d) 108.

Western Section. June 23, 1960.

Certiorari Denied by Supreme Court December 9, 1960.

74

Ham Patterson and W. C. Rodgers, Memphis, for plaintiff in error.

William I. McLain and Don Owens, Memphis, for defendants in error.

AVERY, Presiding Judge (W. S.). This suit was originally filed by Geneva Lee Roberts, plaintiff, against Linda Van Allen Houstoun Hickson, Lawrence Orson Houstoun, Jr., and Norman Sprague, in the Circuit Court of Shelby County, for alleged damages resulting from physical injury alleged to have been caused by an assault upon the said Geneva Lee Roberts. Before the case was

tried, the case was non-suited as to Linda Van Allen Houstoun Hickson.

The case was tried in Division III of the Circuit Court before Hon. A. O. Holmes, Judge, to a jury, and there was a verdict for the defendants. The plaintiff below is plaintiff-in-error here and for convenience she will be designated in this opinion as "plaintiff", and the defendants-in-error here will be designated "defendants" or by their respective names.

An appeal from the verdict and judgment of the Court below was granted, perfected, and errors have been assigned. The case was heard by this Court on the 14th day of April, 1960 and is disposed of by this opinion.

The issues made below and in this Court, together with the Assignments of Error and the contention of the parties, requires that the declaration and the pleas, both of which are short, be copied into this opinion.

The declaration is as follows:

"The plaintiff sues the defendants for the sum of Twelve Thousand and Five Hundred Dollars ($12,-500.00) as damages, both actual and exemplary, and for cause of action alleges the following matters:

"The defendants willfully and maliciously assaulted and beat the plaintiff about the face and body on August 14, 1958, in Shelby County, Tennessee, as a direct and proximate of which acts of the defendants the plaintiff received multiple contusions and cuts about her face and body, injuries in the cervical region of her spine, suffered and is still suffering excruciating pain, both physical and mental, and is permanently injured. She further alleges that she

was hospitalized and is still under treatment by doctors, which treatment will continue for an indeterminate time in the future.

"Wherefore, the plaintiff sues the defendants and demands a jury to try her action."

There is a not guilty plea, and upon motion made and granted, special pleas were filed, and these are as follows:

"Come the defendants and, pursuant to order of Court to plead their defenses specially to the Declaration filed against them in the above cause, say:

"That they deny they willfully and maliciously assaulted and beat the plaintiff about the face or body. They deny that the plaintiff received multiple contusions or cuts about her face and body or injuries in the cervical region of her spine or that she suffered or is still suffering excruciating pain, physical or mental, or is permanently injured. They deny that she was hospitalized or is still under the treatment of doctors as a result of any conduct of the defendants.

"The defendants deny that they are guilty of the matters, wrongs and things complained of in the plaintiff's Declaration, in the manner and form therein alleged, or in any other manner and form.

"The defendants aver that at the time and place complained of these defendants had assisted Mrs. Linda Hickson, the sister of the defendant, Lawrence Orson Houstoun, Jr., in obtaining her minor child. That they had taken the child, returned to their automobile, and had entered the same and were in the process of driving from the scene when the plain-

tiff, who was an interloper in the premises and who had no moral or legal obligation with respect to the welfare of the child, threw herself on the moving vehicle in an attempt to prevent the defendants and the aforesaid Mrs. Hickson from leaving the scene. That any injuries received by the plaintiff or damages resulting therefrom were the direct and proximate result of the unlawful, negligence and careless conduct of the plaintiff.

"The defendants deny that they were at fault in the premises.

"And Now, having plead their defenses specially to the plaintiff's Declaration, the defendants pray to be hence dismissed with their reasonable costs."

This suit grows out of an estrangement between the original defendant, Linda Van Allen Houstoun Hickson, and her husband, David Hickson, which involves the custody of their baby child, Leslie Hickson, who was at the time of the incident complained of, about 15 months old. It is insisted that while this baby child was in legal custody of the plaintiff, who is a sister of the child's father, David Hickson, the defendants, Lawrence Orson Houstoun, Jr., and Norman Sprague, together with the baby's mother, took the child away from the plaintiff and in doing so committed an assault upon her, by which she was injured.

The defendants, said Houstoun and Sprague, both lived in New Jersey at the time. They flew to Memphis, rented an automobile, and together with the child's mother, went out to the home or apartment where the plaintiff lived and where the child was on the 13th day of August, 1958, where the mother of the child went in the

house and stayed an hour or two, while the two men defendants sat in the car behind some bushes or shrubbery obstruction out of view of the house, and then on August 14, 1960 they went out again to the same place, stopped the automobile behind some shrubbery, and the mother went into the room where the child was, picked her up and started back towards the car before plaintiff knew she was there, and the plaintiff undertook to get the baby away from her, was unable to do so, and contends that she was assaulted as she undertook to retake the child, from which place the defendants, together with the child and the child's mother, drove to Baton Rouge, Louisiana, boarded a plane there and flew back to New Jersey.

It is the contention of the plaintiff and her attorney that the legal custody had, by proper order of the Chancery Court, been given temporarily to the father, David Hickson, and his mother who were living at the time in an apartment alongside that of the plaintiff, and that by direction of the father, who was at work and with the permission of his mother, the child was at the moment when taken left in the custody of the plaintiff who had authority to resist the taking away of the child, even by its mother and the two defendants.

On the hearing, counsel for plaintiff introduced, as a part of her evidence, the Order of the Court by which he insisted the plaintiff had legal custody of the child through permission from its father and the paternal grandmother, and which is a Consent Order in the following words:

"In this cause, The complainant having filed a Bill of Divorce, and the Defendant having filed an answer and cross-bill, and having therein a request

for an injunction, the application for which having been tentatively set for Wednesday 2 PM, wherein the cross-complainant had requested that the cross defendant deliver the minor child of the parties to cross-complainant and to be enjoined from coming around cross complainant, etc.,

"It is therefore ordered adjudged and by consent of attorneys decreed by the Court:

"That the said Cross Complainant Linda Van Allen Houstoun Hickson, be and is hereby permitted to see and visit with the said minor child Leslie, at the complainants residence with his mother, each Monday, Wednesday and Friday, from 2 to 4 PM, individually and in proper attire, beginning Wednesday August 6th, 1958, and that the said minor child shall continue to remain in the custody of the complainant and his mother Mrs. Vera Posey, until the final hearing of the said cause, at which time final disposition will be made of the said custody, and that the said visitation shall be at complainant's residence with his mother at 834-836 Woodland Ave., Memphis, Tenn."

After this alleged assault had been committed, the learned Chancellor of Shelby County issued a show cause Order directing the mother of the child, her brother Lawrence Orson Houstoun, Jr., and his friend, Norman Sprague, to appear and show cause why they should not be held in contempt of court for a violation of the foregoing Order. A copy of the Decree of the Court upon the show cause Order appears as Exhibit 1 to the testimony of Malone, a witness for the defendants. This was introduced in the trial of this case by the defendants over

the objection of the plaintiff and exception to the action of the Court allowing it as evidence in the case, is saved.

The pertinent part of this Order to be shown in this opinion is as follows:

"It appeared upon the testimony of the complainant herein, David Hickson, statement of counsel for the parties and the record in this cause that Lawrence Orson Houstoun, Jr., and Norman Sprague were present in court; and that the defendant, Linda Van Allen Houstoun Hickson, with the minor child, Leslie Van Allen Hickson, were within the jurisdiction of the Court. It further appeared to the Court that the order should be dismissed as to all three parties, Linda Van Allen Houstoun Hickson, Lawrence Orson Houstoun, Jr., and Norman Sprague, and that the costs should be adjudged against the complainant, David Hickson.

"It further appeared to the Court that the physical custody of the said minor child, Leslie Van Allen Hickson, is presently in her mother, the defendant, Linda Van Allen Houstoun Hickson, and the Court should not disturb this custody; and further, that the defendant should be permitted to take said child out of the jurisdiction of the Court and to the home of the defendant's parents, Mr. and Mrs. L. O. Houstoun, Sr., Rockleigh Road, Rockleigh, Passaic County, New Jersey.

"It is, therefore, ordered, adjudged and decreed by the Court that the show-cause order heretofore entered herein be and the same is hereby dismissed as to all parties, namely, Linda Van Allen Houstoun Hickson, Lawrence Orson Houstoun, Jr. and Norman

Sprague. Further, that the costs in said cause be and the same are hereby adjudged against the complainant, David Hickson, for which let execution issue.

"It is further ordered, adjudged and decreed that the custody of the minor child, Leslie Van Allen Hickson, in her mother, the defendant herein, Linda Van Allen Houstoun Hickson, not be disturbed and that the defendant be and she is hereby authorized to take the child with her to the home of her parents, Mr. and Mrs. L. O. Houstoun, Sr., Rockleigh Road, Rockleigh, Passaic County, New Jersey, pending further orders of this Court.

"The transcript of the proceedings upon the Order entered Sept. 26, 1958, which has been filed in this Court, authenticated by the Registrar of this Court, is made a part of the record in this cause."

When this contempt proceedings was heard, the two male defendants voluntarily came back to Tennessee, together with the mother and the child, and while here, this damage suit was filed and served on them in Tennessee. After the suit was filed, upon proper notice and over the objection of counsel for the plaintiff, the pretrial deposition of the plaintiff was taken in accord with Sections 24-1201 and 24-1219, T. C. A., which is the codification of Chapter 54, Public Acts of 1959.

Assignment of Error I asserts that the Court erred by permitting and ordering that pre-trial deposition taken, because the application so to do (a) did not show that the facts and data sought thereby was not already available to the defendants; and (b) that the Act which

authorized the taking of the pre-trial deposition, is unconstitutional, in that—

(1) It amends the general discovery Act without mentioning the substance of the Act or the caption thereof, contrary to Article 2, Sec. 17, of the State Constitution;

(2) That it allows unreasonable searches and seizures of property without due process of law, contrary to Art. 1, Sec. 17 of the State Constitution, and the 4th and 14th Amendments to the National Constitution;

(3) That such action amounts to depriving the plaintiff of her property without a judgment in violation of Secs. 8 and 17, Art. 1, of the State Constitution;

(4) That it supersedes the general laws of the State and violates Art. 2, Sec. 17, of the State Constitution; and

(5) That it was error to take said deposition and not make available a true copy of same to plaintiff.

We have carefully read the entire argument made by counsel for plaintiff and the law relied upon by which he insists that the constitutional rights of his client were invaded by the taking of this pre-trial deposition. It seems to us wholly unnecessary to consider this Assignment of Error further than to say that though counsel for plaintiff contends that the evidence shows the defendants switched their defense, as set out in their pleas, after getting this deposition, a careful reading of the entire record does not disclose that this fact prejudiced the Court or the jury in any wise, and though we pretermit the question of its constitutionality because the taking of that deposition in no wise affected the procedure or the verdict of the jury, consequently, to that extent and to that extent only, this Assignment of Error is

overruled. T. C. A. sec. 27-117. Therefore, a determination of the constitutionality of said Act is pretermitted.

Assignment of Error II is that there is no evidence to support the verdict of the jury and the judgment of the Court thereon.

To this Court, Assignment of Error III is of the most importance and therefore it is set out as follows:

## "III

"The Court erred, in permitting, over plaintiff's objection, (R. pp. 170, 177, 219, 237, 241, 262-264, 275, 281, and 295), and without any special pleas or defenses on such matter, the introduction by defendants of evidence consisting of testimony and Court records pertaining to facts and proceedings in a certain divorce suit in the Chancery Court of Shelby County, in a cause styled David Hickson vs. Linda Van Allen Houstoun Hickson, No. 60574, therein, because defendants had based no special pleas of defense thereon, although required to plead defenses specifically (R. p. 10), it being obvious these were offered only for the purpose of prejudicing, and they did prejudice, the Jury in the consideration of their verdict."

The other Assignments of Error are all leveled at the alleged erroneous charges contained in the general charge of the Court and the failure to charge certain special requests, each of which will be referred to hereinafter.

An element for consideration, as insisted by the plaintiff, is whether or not these defendants knew, or were charged with the knowledge thereof, at the time they took

the child, of the divorce proceedings and the Order which had been entered by consent, giving temporary custody of the child to the father. This Order was entered, as shown by this record, on August 5, 1958, at 10 o'clock. Carbon copy thereof appears in this record as Exhibit No. 1 to the testimony of Abe L. Roberts, and is shown at p. 325. While it does not show what minute book and page it is entered in, the fact that it is signed by counsel for both parties to the Chancery suit, and written thereon the words and figures—"Entered by Abe L. Roberts 8-5-58 10:00", we must assume, since the bill of exceptions was properly signed by the Trial Court, that it was entered on the minutes of the Chancery Court as shown by that notation.

We think and find that there is a clear inference that these defendants did know, not only that a suit was pending, but that there had been some agreement to the effect that the father of the child was to retain custody until the case was finally disposed of. It seems proper, therefore, to quote from the evidence rather extensively. On this question, Mr. Houstoun testified on cross-examination as follows:

"Q. Didn't she tell you there was a divorce suit pending? A. She told me she certainly didn't want to stay married to that man. Whether she had at that time told me she had filed for divorce, I don't recall. I am certainly aware of it now.

"Q. Of course you know a Court has jurisdiction of matters of that sort? The Court is able to take care of those things without interference? A. I am aware of that.

"Q. Your position makes you know those things? Doesn't it? A. Yes, sir.

\* \* \* \* \* \*

"Q. You had talked to your sister about everything that had occurred? A. We had talked about a great many things.

"Q. And she went over the whole situation with you? A. She told me a great many things, yes, sir.

"Q. She told you the Court had fixed the custody of this child in her husband temporarily? A. She did not.

"Q. You didn't ask her that? A. I was not aware that there was any Court action on this at all. I had never heard of a situation where the Court would ever award custody of a child to its father. I did know that the father had taken the child from her twice.

"Q. Didn't she tell you that she had been going out to see the child on different occasions? A. She indicated to me that there had been some arrangement so that she coud at least see the child.

\* \* \* \* \* \*

"Q. At any rate, as soon as you got here, you and your friend, Mr. Sprague, and your sister agreed between yourselves to get this child under any circumstances, didn't you? A. 'Under any circumstances' covers a lot of area. We had definitely agreed that we were going to take the child back to New Jersey, and we had also agreed, incidentally, that we would be assured that she would not be involved in any violence.

"Q. Who assured you of that? A. We assured ourselves that we would not be involved in any violence.

"Q. In other words, your agreement was that you were going to get this child by any means necessary? A. I couldn't answer that 'by any means necessary', and I certainly intended no violence of any kind.

\* \* \* \* \* \*

"Q. You knew this child was in Mrs. Roberts' home and not in your sister's home? A. I was aware of that."

Defendant Norman Sprague testified with respect to his knowledge of the pending procedure, and said:

"Q. What was your purpose in running with the baby? A. We want to get the mother and child back to New Jersey before Hickson came and took it again. He had taken it twice, and we had no idea what he would do next.

"Q. You knew, of course, that there was a divorce proceeding pending? A. Yes, I knew that.

"Q. You knew that the Court had jurisdiction of both the mother and baby? A. No, I did not know that. I have always been under the impression that you can go somewhere else. I didn't know you had to stay where the divorce proceeding was taking place.

\* \* \* \* \* \*

"Q. In dealing with welfare, of course, you know that the Courts have charge of people that are not capable of taking care of themselves? A. Yes, sir.

"Q. You knew that the Court in this divorce proceeding had charge of this baby and had custody of this baby, didn't you? A. I did not know that.

\* \* \* \* \* \*

"Q. You went out there and cased the scene and so on the day before? A. We did that, yes."

Mrs. Linda Houstoun Hickson, the mother of the child and the sister of the defendant Houstoun, relative to the knowledge by all three of them who carried the baby away, that suit was pending and an Order granting temporary custody of the child to the father, with her right to see it at certain times, after stating that she knew the divorce suit had been filed and that the father had custody of the child at the home of Mrs. Roberts, and prior to the time that the alleged assault was said to have occurred, testified as follows:

"Q. During that period you were in contact with Mr. Weldon, an attorney? A. Yes.

"Q. Did he advise you that they would ultimately work out a visitation period for you? A. Yes.

"Q. Were you at any time advised that there had been an Order entered in the Court giving the temporary custody to your husband and his mother? A. No.

"Q. Now what would be the situation out there when you went down on those visitation periods to see your child? A. Well, I could go to see her on Monday, Wednesday and Friday between the hours of two and four. There would always be someone else there with Mrs. Roberts, the woman next door or the colored woman or else someone there in the

house, and I couldn't ever bring anyone with me, and I couldn't touch the child and pick her up from the very beginning, and afterwards they decided that I could—that I was allowed to hold the child.''

She then testified that during that time she lived in the apartment where she and her husband had lived together before the separation, and she was asked and answered:

''Q. Mrs. Hickson, what did you ultimately do with respect to contacting your brother? A. Finally I called my parents and they suggested that my brother might be able to help me come down and get the baby somehow.

''Q. Were you desirous of getting the baby and going back to New Jersey? A. Yes, sir.

''Q. Now did you have a divorce suit having been filed against you, and had you filed a cross-suit? A. Yes, sir.

''Q. And both you and Hickson had asked for the custody of the child? A. Yes, sir.

\* \* \* \* \* \*

''Q. Go ahead and tell the Court and Jury what occurred on the day in question, that is, August 14th? A. Well, we had been out there the day before. It was one of my visiting days, the day before, and I went out to see the child and spent a couple of hours with her.

\* \* \* \* \* \*

''Q. Did you actually try to get the child the day before, if the circumstances had been right? A. We

would have, but there were too many people around there. Mrs. Roberts' son was in the house and she just wouldn't leave me alone in the room with the child at all, and it was just impossible for me to get her without starting to hurt somebody, and I didn't want to do that.''

On cross-examination, she testified:

''Q. Why were you going out there on Mondays and Wednesdays and Fridays if you didn't think there was a Court Order? A. I was told that possession was nine-tenths of the law, and that since my husband had the child and she was being well taken care of, I was to leave her out there.

\* \* \* \* \* \*

''Q. You mean that your lawyer didn't tell you that he had entered an Order in Court regarding the custody of that child? A. No, he didn't.

''Q. Did you talk to your lawyer about it? A. I talked to my lawyer about the baby, yes, every day.

''Q. He told you what time the Court provided for you to go see the baby? A. He said there had been an arrangement and said that I could go and see the baby three times a week between the specified hours.

\* \* \* \* \* \*

''Q. And you told them there was a Court Order effective—(Interrupted) A. *I told them there had been an arrangement made that I could see the baby.* (Emphasis added.)

"Q. Didn't you tell Mrs. Roberts that there had been a Court Order entered so that you could see that baby and you were out there to see it? A. I don't think I used the words 'Court Order'. I think I said an arrangement had been made.

\* \* \* \* \* \*

"Q. And you were to have the privilege of seeing the baby on Mondays, Wednesday and Friday? A. I knew that, but I didn't know that my husband had received custody, temporary custody.

"Q. Why did you think he was keeping it and you were only allowed to go out and see the baby if he didn't have custody? A. *I assume that the Judge had said that there was no sense in the child being haggled back and forth from one parent to the other so long as she was being taken care of.* (Emphasis added.)

\* \* \* \* \* \*

"Q. And you knew when the Court had said that it was best for the child to stay where she was and not to be carried backwards and forwards? You knew that, didn't you? A. Yes, but I didn't know there had been a Court Order."

She was then asked about what she had said to her brother and her telephone conversation when she asked him to come down to Tennessee and help her. She was asked and answered:

"Q. You asked him to come down and get the baby and help you get away? A. Yes, sir, that was part of it.

"Q. That was it from the start wasn't it? A. Yes, sir.

*   *   *   *   *   *

"Q. So your brother and his friend had parked down the street and looked over the scene out there the day before, hadn't they? A. Yes, sir.

"Q. This day they parked down behind the trees so that Mrs. Roberts couldn't see the car didn't they? A. That's right."

Mr. W. K. Weldon, attorney for the mother of the child, who had filed the answer and cross-bill in the divorce case for her, was introduced by defendants. He undertook to explain why he thought he had not told Mrs. Hickson about the actual entry of the Order, which amounted to the assertion that he could not get in touch with her. On cross-examination he was asked and answered:

"Q. You did tell her immediately on the entrance of that Order that she had the right to go to see the child on Monday, Wednesday and Friday? A. Prior to that I told her Monday, Wednesday and Friday, or Tuesday, Saturday and Thursday, but at that particular conversation I have reference to, I don't believe there was any stated day, because what she wanted was the child itself.

"Q. Now, Mr. Weldon, I am trying to make my question simple. You did tell Mrs. Hickson following the okay by you and the entrance of that order that she could see that child on Monday, Wednesday and Friday? A. Not to my knowledge.

"Q. How could she know to go out there on those days? Can you explain that to us? A. No, I don't believe I can.

"Q. You are stating to this Court and Jury that you didn't communicate any further to your client about seeing her child, is that it? A. Of course I told her that she could see the child whenever she could.

\* \* \* \* \* \*

"Q. In other words, you never saw Mrs. Hickson after you okhed this Order at all, did you? A. I can't state definitely that I did not see her. I can't state exactly when I did.

\* \* \* \* \* \*

"Q. Mr. Weldon, this Order was in full force and effect on the 14th day of August, 1958, wasn't it? A. To the best of my knowledge, it was."

Mrs. Linda Hickson, on recall, stated:

"Q. Now then on that occasion you insisted that you were entitled to see the child because that was Monday afternoon and your lawyer had just telephoned you that you had a right to see the child on Monday afternoon, Wednesday afternoon and Friday afternoon? A. No. Well, there is something slightly wrong with that. My lawyer, Mr. Weldon, had told me that he was going to make a gentleman's agreement with Mr. Roberts saying that I could see the child every Monday, Wednesday and Friday between 2:00 and 4:00, and he had told me that over the weekend, just sometime—I don't remember whether it was Saturday or Sunday or when it was,

but he told me it was going to be Mondays, Wednesdays and Fridays, and since it was a Monday, I figured I could see the child.''

Mrs. Hickson stated that she understood an application for injunction was to have been heard on Wednesday following the Tuesday when the record shows the order granting the temporary custody of the child to Mr. Hickson was entered; and she was asked and answered:

"Q. Your lawyer told you that the reason or the fact that the Court agreed to it, it wouldn't be necessary for you to appear on Wednesday for the application for the injunction? A. I don't remember. I don't remember that much about the procedure.

\* \* \* \* \* \*

"Q. That was your plan, in other words? A. Yes, it was my plan that I wanted to get the baby before the 15th.

"Q. That's what you called your brother down here for to help you? A. Yes, sir.

\* \* \* \* \* \*

"Q. Mr. Weldon still represents you, doesn't he? A. No, sir.

"Q. When did he cease to represent you? A. Just before my divorce.''

On page 111 of this opinion we have shown a copy of the Order of the learned Chancellor of the Chancery Court of Shelby County, wherein he dismissed the contempt charges against the three original defendants in this cause. It is shown by the Clerk and Master of the

Chancery Court that this Order was entered on October 6, 1958, nearly two months after the alleged assault occurred. The witness Malone, Clerk and Master, was introduced by the defendant. After showing his official designation, he was asked and answered:

"Q. Do you have before you there an Order dismissing a Show Cause Order and authorizing the defendant to remove a minor child from the jurisdiction of the Court? A. I have.

"Q. What date was that Order entered, please, sir?

"Mr. Rodgers: If the Court please, I think all that is objectionable. I don't think any of it is competent.

"The Court: Now let's see. You introduced an order about the pendente lite custody.

"Mr. Rodgers: That was a Consent Order.

"The Court: Well, he now wants to enter an Order on the citation for contempt.

"Mr. Owens: Only the Order.

"The Court: The order on the hearing in which these defendants were involved, am I correct?

"Mr. Owens: Yes, sir.

"The Court: In which these defendants were charged with being in contempt of Chancery Court because of this very transaction? A. Yes, sir.

"The Court: I believe he would be entitled to do that, Mr. Rodgers, because you showed one side of the contempt proceedings, and he would be entitled to show his.

"Mr. Owens: Would you answer the question now, what date was that Order entered, Mr. Malone? A. It was entered October 6, 1958.

"Q. I wish you would read that with me so that we can substitute that as an accurate copy."

The record then shows that the entire Order, as shown in this opinion on the pages aforesaid, was read to the Court and the jury. The witness was then asked and answered:

"Q. And that is signed on the outside, I believe, by Chancellor Ceylon Frazer on 10/6/58? A. Yes, sir. Mr. Owens, the names of the attorneys don't appear on here.

"Q. With the exception of that, is that an accurate copy of the document? A. Yes, sir."

The record then shows that the document was received in evidence. The objection to the entry of that Order was based upon the ground that it was not competent and that the action of the Chancery Court in dismissing the contempt proceeding was not specially pled.

The learned Trial Court, it will be observed, permitted this Order to be read as evidence on the theory that because the plaintiff had offered the pendente lite custody Order which had been entered early in August and was in effect before and at the time the alleged assault occurred, made the Order on the contempt citation competent. The purpose of plaintiff in offering the pendente lite Order was evidently to show that the father of the child and the paternal grandmother were given possession temporarily and that the father and the grandmother were the ones who permitted the plaintiff in this cause,

sister of the father of the child, to have the possession of the child at the actual time of the alleged assault.

We are not able to follow the reasoning of the learned Trial Court in permitting this Order of the Chancellor to be offered in evidence by the defendants in justification of their acts in assisting the mother of the child to take the child out of the possession of plaintiff under the circumstances and in the manner as shown by this record. We think his Charge to the jury indicates that he gave no consideration to either action of the Chancery Court. The question then is whether we can affirmatively say that the jurors did. In his general Charge he said to the jury:

"Before I start to tell you what the lawsuit is, first let me state to the Jury two things that these lawsuits are not. They are not lawsuits to pass on the right to the custody of any minor child. The jurisdiction of the custody of any minor child that might have ever been mentioned in the course of the trial of these cases is in the Chancery Court of Shelby County, and that Court has made its adjudication as to custody, so you are not concerned with that, nor is it a lawsuit to uphold or enforce any Order of the Chancery Court of Shelby County. The Chancery Court of Shelby County is entirely capable of enforcing and protecting its own decrees, and the Circuit Court enforces and protects its decrees, and as such can take care of its own in that regard.

"These are suits, though, for alleged assault and battery committed upon the person of the plaintiff, Mrs. Geneva Lee Roberts, and Mrs. Roberts has filed here in Court a paper writing that is called the dec-

laration of the plaintiff, in which she sets forth the basis of claim that she says she has against the defendants, Lawrence Houstoun and Norman Sprague.''

He never again referred to either of the Orders of the Chancery Court, nor did he withdraw either of them from the consideration of the jury.

We think the jury could have well inferred that the mother and both the other defendants, who were finally brought to trial in this cause, had knowledge of the existence of this pendente lite custody Order, and the fact that they were not held in contempt by the Chancellor for the violation thereof, cannot be shown by his Decree wherein he refused to so hold them in contempt of his pendente lite Order as justification for concealing themselves, after having ''cased'' the premises the day before, and discussed the matter with the child's mother, and the next day concealing themselves near the premises until the mother had opportunity to go into the house, surreptitously take the child away from the possession of the plaintiff, all of which was planned and purposely carried out in accord with their previous arrangement to assist the mother in getting that child and leaving the State of Tennessee with it, which they freely admitted.

It is insisted by counsel for plaintiff that the defendants were guilty of kidnapping in addition to being in violation of the Court Order at the time the baby was taken from Mrs. Roberts.

The general rule with respect to the liability of parties who are involved in a conspiracy to violate the law or to violate a valid Court Order is stated in Day v. Walton,

199 Tenn. 10, 281 S. W. (2d) 685, 688, approving a quotation from 52 Am. Jur. 455, Sec. 116, as follows:

"The general rule is that two or more persons engaged in a common enterprise are jointly liable for wrongful acts done in connection with the enterprise, at least where the enterprise is an unlawful one, in which case all are answerable for any injury done by any one of them, although the damage done was greater than was foreseen, or the particular act done was not contemplated or intended by them. In this respect, it has been held that where two persons are jointly engaged in an unlawful enterprise, and each performs a wrongful act in pursuit of such purpose, one of which acts causes an injury, the parties may be held jointly and severally liable, although it is not known which of the acts caused the injury. On the other hand, there is authority for the rule that where two or more are acting lawfully together in the furtherance of a common lawful purpose, one is not liable for the unlawful act of another, done in furtherance of the common purpose without his concurrence."

We do not have to determine the question of whether or not the defendants were guilty of the offense of kidnapping, but the jury could well have inferred that they were engaged in a conspiracy to violate not only the pendente Chancery Court Order but to violate the law, in that the jury could have well inferred that they had conspired to take this child away from the plaintiff, even if they had to do so by committing an assault upon her, and we think the fact that they concealed themselves two different days at the premises in question and on the final day, after having concealed themselves so that

the mother of the child could go up to this house and then when they saw her leaving the home with the child and coming down to the street, they drove up to where she was, opened the door so mother and child could get in, then one of them grappled with plaintiff while the car was moving, and she fell to the ground. They then made their way a great distance to an airport at Baton Rouge, Louisiana, and there immediately took a flight back to New Jersey by air; that the effort made before, at the time of, and immediately after the alleged attempt, as stated by their own testimony, is indicative of a conspiracy to violate the law and their action is such that a clear inference could have been drawn by the jury from all of the proof that they were guilty of conspiring among themselves to commit a crime, which in and of itself is a crime.

It is very true that the defendants and the mother of the child all testified that they did not assault the plaintiff, but the unmistakable proof is that the plaintiff and the defendant Sprague were grappling with each other at the car before it started and at the time that it was moving away on instructions from Sprague, and there can be no reasonable inference drawn from their own testimony but that her injuries were caused from the result of grappling with this man while his codefendant was driving that car away, so that when she was thrown to the ground her injury resulted. If the allegations of the plea were shown by the proof to be as pled, there would remain the question of whether the defendants were guilty of an assault and battery by the way they maneuvered the car.

■ ■ We are unable to find any proof in the record from which the jury could have drawn any inference that

the plaintiff was attempting to assault the mother of the child, and that the action of these two defendants was in defense of or to prevent an assault upon the child's mother or that the defendants could have possibly labored under apprehension that Mrs. Hickson was in danger of any bodily harm, though the Court charged at great length on the defense of protecting another from assault. The proof all indicates to us that what the plaintiff was trying to do was to (1) get hold of the baby and (2) to make an alarm which could be heard by others in an effort to attract attention to that which was being done, and (3) to prevent flight of the car. It seems further to us that if the defendants expected to rely upon the fact that an assault was committed upon them or an assault attempted by the plaintiff upon Mrs. Hickson, such must be specially pled. T.C.A. sec. 20-921, supported by the cases of: Creekmore v. Woodard, 192 Tenn. 280, 241 S. W. (2d) 397; Denny v. Webb, 199 Tenn. 39, 281 S. W. (2d) 698; Myles v. Butler, 202 Tenn. 290, 304 S. W. (2d) 306. Under the same authorities, it seems to us that if the defendants were going to rely upon the Order of the Chancellor discharging them in the contempt proceedings, such should have been specially pled.

In the case of Creekmore v. Woodard, supra [192 Tenn. 280, 241 S. W. (2d) 398], the declaration alleged that Mrs. Creekmore was riding in and driving the involved automobile at the time of the accident, though she was not the owner. She was ordered to plead her defenses specially. In responding to the Court's Order to plead specially, she did so, stating that she relied also upon her plea of not guilty and enumerated certain contributory negligence on the part of the defendant, but she did not specially plead that she was not driving the automo-

bile. The Supreme Court in that case held that not so specially pleading, she would not be permitted to testify that she was not driving the automobile, and quoting the language of the statute, said:

"If that language is given its natural meaning Mrs. Creekmore was required to expressly state all substantive facts relied on as a defense. There is nothing in the face of this code section which would justify a departure from the natural meaning of this expression. It seems to follow necessarily that Mrs. Creekmore was required by the just quoted language in Code Section 8767 (now TCA Sec. 20-921) to expressly deny the allegation that she was driving the automobile at the time of the collision if she expected to interpose such denial as a defense."

In Denny v. Webb. supra [199 Tenn. 39, 281 S. W. (2d) 701], wherein there was a discussion of the requirement to plead every specific defense, the Court said:

"This Court many years ago in Provident Life & Accident Ins. Co. v. Prieto, 169 Tenn. 124, 159, 83 S. W. (2d) 251, 264, among other things said that one of the purposes of this special plea was 'to enable a plaintiff to be forewarned of every matter of defense intended to be relied on by a defendant, and to require a defendant to make explicit all matters of defense which otherwise would be implicit in pleas of the general issue'. In Creekmore v. Woodard, 192 Tenn. 280, 285, 241 S. W. (2d) 397, 399, we said that when such a special plea is required under Code Section 8767 that the general issue is abolished 'and he must plead specially not only every affirmative defense upon which he expects to rely, but likewise he

must specially and expressly make denial of those substantive allegations of the declaration which he plans to deny as a part of his defense.' ''

In Myles v. Butler, supra, our Supreme Court in an opinion by Chief Justice Neil, discussing the special defense statute, said [202 Tenn. 290, 304 S. W. (2d) 309]:

"The statute relating to special defenses (20-921, T.C.A.) is specific in requiring that the plea 'shall state the facts relied on, truly, and briefly', and that the defendant shall make explicit all matters of defense which otherwise would be implied on pleas of the general issue. Provident Life & Acc. Ins. Co. v. Prieto, 169 Tenn. 124, 83 S. W. (2d) 251; Creekmore v. Woodard, 192 Tenn. 280, 241 S. W. (2d) 397; Hammett v. Vogue, Inc., 179 Tenn. 284, 165 S. W. (2d) 577."

█ Assignment of Error IV is as follows:

"The Court erred in submitting to the Jury a defense of assault and battery on the part of the plaintiff, Geneva Lee Roberts, and in justification of the defendants' wrongful acts and admitted assault and battery on her (R. pp. 303-305, 309-311, and 315), because, the defendants had pled no such special defense, had expressly and repeatedly admitted their conspiracy, and concert of action, in direct violation of the Chancery Court order, vesting the father, David Hickson, with the custody of the said child, (R. p. 078, Exhibit 1), and further erred in repeating such charge, thereby emphasizing said defense, in response to an inquiry of the Jury with reference thereto (R. pp. 321 and 322), during their deliberations, making it evidence that the Jury had been con-

fused thereby and was greatly prejudiced and influenced in their verdict by said unpleaded nonexistent defense, and improper charge."

Assignment of Error VI goes to the same alleged error as raised by Assignment IV. It elaborates upon the submission by the Court to the jury of the right of the defendants to protect Mrs. Hickson from assault by the plaintiff, and sets forth as error that part of the Charge of the Court relating to the right of the defendants to resist an assault on Mrs. Hickson. After the Court had summarized the issue stated by the plaintiff, in a short statement and in a proper manner, he then entered into an analysis of the pleas of the defendant. He began that part of his charge by saying:

"On the other hand, the defendants say that they did not commit any assault and battery on Mrs. Roberts, but that on this occasion what they were doing was trying to take Houstoun's sister in the car with the baby and leave, and that Mrs. Roberts was the one that jumped on the vehicle and was trying to commit an assault and battery on Houstoun's sister, and that whatever, if any, force was used by either of them was only such force as was necessary to protect Mrs. Hickson and to prevent her from having an assault and battery committed on her by Mrs. Roberts, and that no excessive force whatever was used."

"Now they are the issues that you are to determine: Whether or not an assault and battery was committed; if it was committed, whether or not it was committed in the necessary self-defense of an-

other; and, of course, the nature and extent of the injury and damages, of course, are always issues.''

In further explanation of the right to defend against an assault on another, the Court further said:

''Under the law a person may act in the self-defense of another person under the same circumstances when and to the same extent that the person defended would have been justified in defending himself or herself, so in this case the defendants, Houstoun and Sprague, had the same right, and no more and no less right, to defend Mrs. Hickson from any attempted attack on her that Mrs. Hickson had to defend herself.

\* \* \* \* \* \*

''Now to constitute the defense of self-defense or defense of another, the belief or apprehension of danger upon the part of the defendant must be formed of sufficient circumstances to authorize the opinion on his part that the hostile purpose then exists and the fear that it will at that time be executed.

''The animosity, if any, of the plaintiff, Mrs. Roberts, toward the defendants or towards Mrs. Hickson, if indicated by her actions, is a proper matter for the consideration of the jury on the question of reasonable apprehension, so that the action of the plaintiff, Mrs. Roberts, must not only show reasonable grounds for fear by the defendant of bodily harm to himself or to Mrs. Hickson, but it must also appear that such fear of bodily harm to the defendants or to Mrs. Hickson was in fact entertained and

that the assault and battery, if any, committed by the defendants was committed under an honest and well-founded belief that it was necessary to commit the assault and battery upon the plaintiff at that time to save the defendants or Mrs. Hickson from a like injury or bodily harm.

"These rights to defend one's person or to defend the person of another exist and continue so long as the proof shows that this danger was present and eminent or is honestly believed to be so upon reasonable grounds."

Under this Assignment of Error, it is said the foregoing charge was error for the reason that there was no such special defenses pled by the defendants, and that this charge was affirmative error.

After the jury was fully charged and had retired for consideration of its verdict, and had deliberated for approximately one hour and forty-five minutes, the jurors returned to the court room and, through their foreman, made the following inquiry:

"Your Honor, as Foreman of the Jury, the Jury has asked that I make a request of you. It seems there is some confusion among the jurors as to what the law is as to assault and battery and self-defense, and they are asking that you re-read your charge to the Jury that has to do with the law on assault and battery."

The Court inquired if they wanted that done at that moment, since it was 4:15 P.M., or if they preferred to wait until the next morning. Whereupon, the jurors seemed to indicate that they wanted to hear what the

Court would say to them at that time. The Court then said:

"The Court: All right, now was it the part that I read to you about the defense of another person?

"Jury Foreman: Yes, sir."

The Court then made a statement, not quoting or reading from the Charge, in which he outlined self-defense, and he then said:

"Later on I told you the law with reference to self-defense or defense of another as a defense to an action for assault and battery is this. To legally excuse or justify an assault and battery committed by one pleading self-defense or defense of another, bodily harm must be either real or honestly believed to be so at the time and upon sufficient grounds. It must be apparent or imminent. There must be some overt act, that is, some open, *manifest and perceptible act at the time clearly indicative of a present purpose to do injury to the party pleading self-defense,* and whether or not there was at the time such an overt act on the part of the plaintiff, that is *an overt act of intent to harm Mrs. Linda Hickson, and what would or would not be such an overt act on the part of the plaintiff, is a matter for the jury to decide under the facts and circumstances as you find them to be from the proof.*" (Emphasis added.)

Also in his general charge, he had said:

"The law with reference to *self-defense or defense of another* as a defense to an action for assault and battery is this: To legally excuse or justify an assault and battery committed by *one pleading self-*

*defense,* bodily harm must be either real or honestly believed to be so at the time and upon sufficient grounds. It must be apparent or imminent." (Emphasis added.)

At different places throughout the Charge, the Court directed the jury's attention to this question of defense of another by using the expression—"one pleading self-defense". We submit that if the special pleas as filed by defendants, that is, the two defendants on trial, are so worded that they plead or in law mean that the defendants are pleading "defense of another" as justification for their act, the Charge to the jury, including the explanation in response to the jurors' question as set out above, would be correct, but we do not understand the special pleas to include a plea of defense of another, so that the plaintiff would be informed that they were pleading an assault by her on either of the three parties present at the time, and that in defense of that assault they used only such force as was necessary to repel it.

We have set out the special pleas on page 109 of this opinion and if we understand what the defendants are in reality pleading, they have specifically averred that there was no assault and battery on either of them by plaintiff. They specifically say, and we repeat that part of it—

"The defendants aver that at the time and place complained of these defendants had assisted Mrs. Linda Hickson, the sister of the defendant, Lawrence Orson Houstoun, Jr., in obtaining her minor child. That they had taken the child, returned to their automobile, and had entered the same and were in the process of driving from the scene when the plaintiff,

> who was an interloper in the premises and who had
> no moral or legal obligation with respect to the wel-
> fare of the child, threw herself on the moving vehicle
> in an attempt to prevent the defendants and the
> aforesaid Mrs. Hickson from leaving the scene. That
> any injuries received by the plaintiff or damages
> resulting therefrom were the direct and proximate
> result of the unlawful, negligent and careless conduct
> of the plaintiff.''

That part of the testimony of Sprague which clearly means that he was on the ground at the car and he and the plaintiff were grappling with each other, and that part of the testimony of defendant Houstoun which corroborates the same statement, is in direct conflict with that part of the plea which said: ''* * * they had taken the child, returned to their automobile, and had entered the same and were in the process of driving from the scene when the plaintiff'' threw herself on the moving vehicle.

The plea, therefore, charges no assault unless it can be said that it pleads an assault on the automobile. Assuming that she was on the automobile just as the plea averred, they evidently saw her in a place of peril in plenty of time to have averted injuring her by stopping the automobile. Their testimony clearly indicates that both Sprague and Houstoun saw the plaintiff in a position of peril which they disregarded and made no effort to prevent injuring her. This analysis of their testimony is supported by that of Mrs. Hickson.

Let us suppose that Mrs. Roberts had gone directly in front of the car, would the defendants have had the right

to have ignored the fact that she was in a perilous situation and driven over her? Certainly they would not.

These defendants and their witness, Mrs. Hickson, all agree that Mrs. Hickson with the baby were in the front seat of the automobile and that when Sprague told Houstoun to drive ahead, he performed the gymnastics of getting Mrs. Roberts loose from him and she fell, and he jumped through an open window into the car in back of the front seat and then climbed over into the front seat with Houstoun, Mrs. Hickson and the baby.

Assignment of Error VII is but a repetition of an over-emphasis of the errors assigned by Assignments IV and VI and leveled specifically at the statement of the Court in answer to the inquiry made by the jurors.

Assignment of Error VIII attacks the statement in the Charge of the Court wherein he merely set out the theory of the defendants, as shown by certain parts of the proof, and this Assignment avers that the Court made those statements as a fact. We do not find this to be true, as he was simply stating a theory, but this theory, as stated, did not conform to the pleas.

Assignment of Error V is leveled at the action of the Court in refusing to charge the plaintiff's Special Requests numbered 1, 2 and 3.

It is the insistence of the defendant that their special pleas which were filed upon motion to so require them, seasonably made and granted by the Court, are sufficiently broad to include all the theories of defendants advanced by the testimony and by the charge of the Court to the jury. In support of this contention they rely upon

Gerwin v. American News Co., 197 Tenn. 51, 270 S. W. (2d) 354, 356, where it is said:

"(1) Facts material to a cause of action, or to a defense of such a cause, are of two kinds, to-wit, (1) ultimate facts and (2) probative facts. Ultimate facts are those essential to the maintenance of the cause of action, or determinative as a successful defense. 71 C. J. S., Pleading, sec. 12, p. 33. Probative facts 'are merely matters of evidence required to prove the ultimate facts'. 71 C. J. S., Pleading, sec. 12, p. 34.

"(2) It is a fundamental rule of pleading that ultimate facts, as above defined, must be plead, but that which is mere evidence to establish the ultimate fact (probative facts) should not be plead. * * *''

We do not think that this case supports the contention of the defendants in the instant case. We agree with the definitions of ultimate facts and probative facts, as stated in Gerwin v. American News Co., supra, but it seems to us that when one relies upon a defense of repelling an assault and battery upon another, it is but a plea of an ultimate fact, and the way and manner that such assault may have been made or may have been repelled, would be probative facts which are not necessary to plead in such cases.

Defendants also rely upon the case of Lively v. Atchley, 36 Tenn. App. 399, 256 S. W. (2d) 58, 60, wherein it is said that in a plea you do not have to use the words "contributory negligence", when the pleas set forth the allegation that the plaintiff in that case, who was a guest, made no protest of the manner in which the defendant was driving. We do think, however, that in that case, when the Court said that the special defensive pleas

" 'shall state the facts relied on, truly, and briefly as may be * *' does not require a defendant to couch his defenses in legal terminology", cannot possibly support the contention made by the defendants that the special pleas in the instant case are couched in such phraseology as to put the plaintiff on notice that they relied upon their right to repel an assault made upon another.

The defendants were also sued by Abe L. Roberts, husband of Geneva Lee Roberts, for damages for loss of service, etc., of his wife, alleged to have been sustained by the injuries to his wife in the same transaction, and that his case and her case were tried at the same time, verdicts the same, but no appeal was perfected by him.

We conclude, therefore that Assignments of Error I and V must be and are overruled.

In view of the record before us, Assignments of Error II, III, IV, VI, VII and VIII must be sustained, affirmative error having been committed by the Court, the verdict and judgment of the Court thereon set aside, and the case remanded to the Circuit Court of Shelby County for a new trial in accord with this opinion. The costs of the case will be taxed and adjudged against the appellees, and the judgment of the Court will be entered in accord herewith.

Carney and Bejach, JJ., concur.